IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| D'SHAWN CASHER,<br>Institutional I.D. No. 1446998,<br><br>Plaintiff,<br><br>v.<br><br>DENNIS MELTON, *et al.*,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 1:14-CV-120-BL<br><br><br>Assigned to U.S. Magistrate Judge |

## REPORT AND RECOMMENDATION

Plaintiff D'Shawn Casher, an inmate proceeding *pro se* and *in forma pauperis*, filed this civil rights complaint pursuant to 42 U.S.C. § 1983, alleging three medical personnel employed by the Texas Department of Criminal Justice (TDCJ) in the French Robertson Unit were deliberately indifferent to his serious medical needs in violation of the Eight Amendment's prohibition of cruel and unusual punishment. The United States District Judge assigned the case to this court to screen pursuant 28 U.S.C. §§ 1915–1915A. (Doc. 9). Pursuant to *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), this court held an evidentiary hearing at which Plaintiff testified. (Docs. 11, 12).

In an *in forma pauperis* prisoner civil rights action against a governmental entity, officer, or employee, the court is required under 28 U.S.C. §§ 1915–1915A to dismiss the complaint or any portion of the complaint which is frivolous or malicious or fails to state a claim upon which relief may be granted. *See Harris v. Hegmann*, 198 F.3d 153, 156 (5th Cir. 1999). A complaint is frivolous when it is based on an indisputably meritless legal theory. *Id.*

# I. BACKGROUND

The earliest medical records indicate that on June 8, 2011, Plaintiff was seen for a mental health evaluation by a non-physician, who referred Plaintiff to Jessie Singh, M.D., for further evaluation. Plaintiff visited Dr. Singh on June 17, 2011, and recounted his history of bipolar disorder and how in the free world he had been prescribed lithium as treatment. Plaintiff voiced regret for going off lithium medication in the past, stating that he does better when taking it. Dr. Singh prescribed Plaintiff lithium 300mg, two capsules in the evening, with the dosage to increase to 300mg, four capsules in the evening one week later, apparently to ease Plaintiff back into the medication. On either July 1 or July 7, 2011, Plaintiff requested that his medicine be switched to a morning administration due to his work schedule—Plaintiff worked from 12:00am to 4:30am and was of the opinion a morning administration "would be easier" for him and more beneficial to his sleep schedule. Dr. Singh disagreed with switching Plaintiff to a morning administration, and kept the evening regimen. On July 7, a hematology report was worked up and showed Plaintiff with slightly low lithium levels (0.47 mmol/L where normal range is 0.6–1.2 mmol/L). Plaintiff went in for a follow up appointment with Dr. Singh on August 30, 2011. Plaintiff reported no side effects from the lithium medication, so Dr. Singh, considering Plaintiff's lowered level of lithium, put Plaintiff on a regimen of 300mg, five capsules in the evening.

Plaintiff was removed on a bench warrant to the Cooke County Detention Center and there was examined by a Dr. Bartlett on November 8, 2011. For reasons not made entirely clear, Dr. Bartlett split Plaintiff's lithium dose to part morning administration, part evening. It appears that Plaintiff was taking either 900mg or 1200mg in the morning and 600mg in the evening.

On November 29, 2011, Plaintiff returned to the care of Dr. Singh at the Robertson Unit. Plaintiff reported no side effects with the lithium, so Dr. Singh returned Plaintiff to the evening only dose. A hematology report dated December 2, 2011, showed Plaintiff's lithium levels to be within the normal range (0.81 mmol/L). In a four month follow-up test, a hematology report dated April 11, 2012, showed Plaintiff's lithium to be nearly the same as in December of 2011 (0.86 mmol/L). The report also stated that Plaintiff had a higher compliance rate than before (83.70% compared to 71.43% in December). Clinic notes from later in April showed even higher compliance rates of 84.03%.

On May 15, 2012, Plaintiff went in for a checkup with Dr. Singh and once again said he did not have any side effects from the lithium medication. Clinic notes dated June 10, 2012 showed that Plaintiff had his highest compliance rate to date of 84.10%. Despite this, a hematology report dated August 15, 2012, showed Plaintiff's lithium levels had lowered to 0.62, still within the normal range, while other blood and chemical levels had fluctuated outside the normal range, as discussed further below.

Clinic records through October of 2012 show Plaintiff continued his good compliance record, and at a check-up appointment on October 22, 2012, Plaintiff reported to Dr. Singh that he had no side effects with the lithium medication. In November of 2012 Plaintiff had various dental problems ultimately requiring surgery. Either as a result of that procedure or for other unnamed reasons, Plaintiff had not taken his lithium medication for the five days prior to a January 16, 2013 check-up with Dr. Singh. In a follow-up on February 1, 2013, however, Plaintiff reported he had taken his lithium medication for the five prior days and so a hematology report was worked up to continue to monitor his blood levels. The February 1 report showed elevated levels of lithium (1.57). On March 22, 2013, Plaintiff wrote an I-60 requesting to go off

his medication until the end of a school program he was attending. At that time, Plaintiff was working the 1:30 am to 5:30 am shift then going to school until 10:00am, "then wait[ing] on pill window then necessities around 4:00 or 5:00 pm." It is unclear for what specific reasons Plaintiff wanted to go off his lithium medication. That same day, Defendant Victoria Simmons, RN, discussed the issue with Plaintiff and suggested he continue taking the medications as prescribed by Dr. Singh and report back if any problems arose. Plaintiff assented.

On April 5, 2013, Plaintiff went in for a checkup with Dr. Singh. Plaintiff stated that because of his high lithium levels in the February 1, 2013 hematology report, he had not been taking his medications as scheduled, although it is not clear just how regularly, if at all, Plaintiff was taking medication. Dr. Singh kept Plaintiff's treatment regimen as it had been before, as there had been no reported side effects from Plaintiff.

However, when an appointment scheduled for June 7, 2013 came around, Plaintiff refused to have a hematology report worked up, and refused treatment again on June 19, 2013. Plaintiff's compliance rate dropped to 59.41% and Plaintiff was not cooperative with medical staff. Plaintiff "refused to sign a refusal to take medication form," and "refused to consider alternatives." Again, Dr. Singh prescribed Plaintiff lithium medication at the same rate as had seemed to work in 2011 and 2012.

The record as to the lithium prescription then falls silent for ten months until April 18, 2014, when Plaintiff submitted a grievance requesting to be seen by someone other than Dr. Singh. (*See* Doc. 1, p. 11). Clinic records show that Dr. Singh neither saw nor prescribed medication to Plaintiff after June 19, 2013, and Plaintiff testified at his *Spears* hearing that he stopped taking his lithium medication altogether in March of 2013. Plaintiff also testified that the reason for the delay from June of 2013 to the filing of his Step 1 and ultimately this action in

April of 2014 was that his mother was researching and working on the lithium issue outside the prison. While she did that, Plaintiff sat idle in prison.

## II. DISCUSSION

Prison officials violate the Eighth Amendment's prohibition of cruel and unusual punishment when they act with deliberate indifference to a prisoner's serious medical needs. *Wilson v. Seiter*, 501 U.S. 294, 297, 303 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). But "[d]eliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). A "plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.*; *accord Easter v. Powell*, 467 F.2d 459, 465 (5th Cir. 2006). Negligence or medical malpractice does not amount to a constitutional violation. *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). Likewise, a disagreement between an inmate and his physician concerning whether certain medical care is appropriate is not enough to make out a deliberate indifference claim, and "the decision whether to provide additional treatment is a classic example of a matter of medical judgment." *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006); *see also Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995). "Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." *Banuelos*, 41 F.3d at 235 (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 193–95 (5th Cir. 1993)).

A review of the record establishes that defendants were not deliberately indifferent to Plaintiff's serious medical need; to the contrary, the record as a whole largely shows a history of

balanced lithium levels when Plaintiff took his medication as prescribed, all with few, if any, reports of side effects by Plaintiff.

Plaintiff's complaint alleges that his lithium dosage was too high and that he should not have been made to work his job assignment, which he claims required him "to work in an environment over 100 degrees," contrary to his work restrictions.

Plaintiff claims his lithium dosage was too high, interpreting his abnormal chemical and blood levels as indicators of his lithium level. First, clinical records show that Plaintiff questioned his lithium medication for the first time following the August 15, 2012 hematology report. That report showed Plaintiff's potassium levels were high (5.2 mmol/L where the normal range is 3.2–4.8 mmol/L) and absolute monocytes were low (0.3 K/uL where the normal range is 0.4–1.3 k/uL). Plaintiff claims these abnormalities "are possible adverse effects of lithium." (Doc. 1, p. 9). However, Plaintiff wholly fails to make a connection between potassium or absolute monocytes and lithium prescriptions. There is nothing whatsoever in the record to suggest any such causation. Additionally, Plaintiff fails to account for the fact that in prior hematology reports, his chemistry levels and blood levels had been outside the normal range with no alarm raised. For example, in the July 7, 2011 hematology report, Plaintiff's glucose levels were low (56 mg/dL where the normal range is 60–110 mg/dL); in the December 2, 2012 hematology report, Plaintiff's potassium levels were high (5.5 mmol/L where the normal range is 3.2–4.8 mmol/L) as were his hematocrit levels (49.9% where the normal range is 36.2–49.5%). The April 11, 2012 hematology report too showed Plaintiff had high levels of hematocrit (50.7%). Yet at each medical visit and checkup during this time, Plaintiff reported he was experiencing no side effects from his medication. Thus, it is unclear what led Plaintiff to complain of the particular abnormalities in his August 15, 2012 hematology report where he had

let blood and chemical levels stray from the normal range without raising alarm to medical staff at the Robertson Unit.

Second, Plaintiff fails to show that his claim the lithium dosage was too high is anything more than a disagreement with his physician. *See Gobert*, 463 F.3d at 345–46. Plaintiff does not contest the hematology reports, which show that in the roughly two year time Plaintiff was taking his lithium medication, his lithium levels were above the normal range only one time, February 1, 2013. In January of 2013, Plaintiff stopped taking his lithium medication then resumed just before the February 1 hematology report.[1] Plaintiff does not show that his lithium levels were high on any other occasion. Thus, the medical records support Dr. Singh's decisions to keep Plaintiff on the lithium dosage that achieved results within the normal range for more than two years. At minimum, the medical records contradict Plaintiff's claims his lithium levels were high, and certainly "rebut [Plaintiff's] allegations of deliberate indifference. *Banuelos*, 41 F.3d at 235.

As to Plaintiff's claims that Dr. Singh required him to work against his heat restrictions, at his *Spears* hearing, Plaintiff conceded that the prison system ombudsman conducted an investigation into whether such allegations were true. The investigation revealed that Dr. Singh had done no wrong and had not improperly given Plaintiff medications that would conflict with Plaintiff's work restrictions. Plaintiff fails to bring any other facts to support his allegations against Dr. Singh in this regard. Plaintiff has simply not shown "that the officials refused to treat him, ignored his complaints, [or] intentionally treated him incorrectly . . . ." *Domino*, 239 F.3d at 756.

---

[1] Without making any medical determination, the court notes that when Plaintiff got back on his lithium medication in July of 2011 after being off it, several weeks elapsed before Plaintiff's lithium levels were within the normal range.

Finally, the court notes that at various times Plaintiff was on a number of different prescription medications, from allergy medication to pain medication for dental procedures to heartburn and indigestion medication. Plaintiff fails to show that any fluctuation in blood content or chemical levels was not attributable to such medications or other factors.

Very simply put, the whole of the record does not support Plaintiff's allegation that Dr. Singh was deliberately indifferent to Plaintiff's serious medical needs. Plaintiff's allegations against Dr. Singh at best show negligence or medical malpractice, which cannot support a § 1983 cause of action. *Farmer v. Brennan*, 511 U.S. 825, 835 (1970); *Sama v. Hannigan*, 669 F.3d 585, 590 (5th Cir. 2012). Plaintiff's claim against Dr. Singh is based on an indisputably meritless legal theory, and is thus frivolous. It, therefore, should be dismissed. *See* 28 U.S.C. §§ 1915–1915A; *Harris*, 198 F.3d at 156.

At his *Spears* hearing, Plaintiff testified that his only involvement with defendant Nurse Simmons was superficial. Plaintiff stated Nurse Simmons would draw blood, but would not analyze the results or prescribe Plaintiff medication or suggest a treatment course independent of Dr. Singh. Plaintiff conceded he "can't say [Nurse Simmons] had intent to harm me. Just negligence." Assuming without deciding that Nurse Simmons was negligent as to Plaintiff's medical care, such negligence cannot support a § 1983 cause of action, as noted. *Farmer*, 511 U.S. at 835; *Sama*, 669 F.3d at 590. Like Plaintiff's claim against Dr. Singh, Plaintiff's claim against Nurse Simmons is frivolous and should be dismissed. *See* 28 U.S.C. § 1915–1915A; *Harris*, 198 F.3d at 156.

Defendant Dennis Melton was the Health Administrator who responded to Plaintiff's Step 1 grievance. At the *Spears* hearing, Plaintiff stated his claims against Melton amounted to the following: "He just didn't monitor Dr. Singh."

"In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor acted, or failed to act, with deliberate indifference to violations of others' constitutional rights committed by their subordinates." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (internal quotation marks omitted) (quoting *Gates v. Tex. Dep't of Prot. Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)). "A supervisor may also be liable for failure to supervise or train if: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Id.* (internal quotation marks omitted) (quoting *Goodman v. Harris Cnty.*, 571 F.3d 388, 3995 (5th Cir. 2009)). As Plaintiff has failed to demonstrate a violation of his constitutional rights by Dr. Singh, Plaintiff concomitantly fails to demonstrate a violation of his constitutional rights by Dr. Singh's supervisor, Melton. Therefore, Plaintiff's claim against Melton is based on an indisputably meritless legal theory and is accordingly frivolous. Plaintiff's claim against Melton should be dismissed.

### III. CONCLUSION

In sum, Plaintiff fails to meet the "extremely high" standard of alleging deliberate indifference. *See Domino*, 239 F.3d at 756. Plaintiff fails to show any defendant was deliberately indifferent to his serious medical need. *See Wilson*, 501 U.S. at 297, 303. Plaintiff fails to show his complaints were more than simply a disagreement with his physician. *See Gobert*, 463 F.3d at 345–46. The medical records soundly rebut Plaintiff's allegations of deliberate indifference. *Banuelos*, 41 F.3d at 235. Plaintiff, at best, shows negligence on the part of the defendants, *see Domino*, 239 F.3d at 756, but negligence cannot support a § 1983 action. *See Farmer*, 511 U.S.

at 835 (1970); *Sama*, 669 F.3d at 590. Because Plaintiff's claim is based on an indisputably meritless legal theory, it is frivolous and should be dismissed. *See Harris*, 198 F.3d at 156.

**IT IS, THEREFORE, RECOMMENDED** that Plaintiff's claims against all defendants be **DISMISSED** with prejudice because they are frivolous.

**IT IS ORDERED** that this case is **TRANSFERRED** back to the docket of the United States District Judge.

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain

**SO ORDERED.**

Dated this ___ day of March, 2015.

_____
**E. SCOTT FROST**
**UNITED STATES MAGISTRATE JUDGE**

-10-